In re HANCOCK–NELSON MERCANTILE COMPANY, INC., Debtor.

Michael J. IANNACONE, Trustee of the Bankruptcy Estate of Hancock–Nelson Mercantile Company, Inc., Plaintiff,

v.

FOOTHILL CAPITAL CORPORATION, and Farm House Foods Corporation, Defendants.

Michael J. IANNACONE, Trustee of the Bankruptcy Estate of Hancock–Nelson Mercantile Company, Inc., Plaintiff,

v.

BERISFORD CAPITAL CORPORATION, Defendant.

Bankruptcy No. 3–86–256.
Adv. Nos. 3–86–165, 3–86–166.

United States Bankruptcy Court, D. Minnesota, Third Division.

Feb. 13, 1989.

 

Michael J. Iannacone, St. Paul, Minn., trustee.

William I. Kampf, Sp. Counsel, Fredrikson & Byron, P.A., Minneapolis, Minn., for trustee.

Katherine A. Constantine and Stephen Lucke, Dorsey & Whitney, Minneapolis, Minn., for defendant Foothill Capital Corp.

James A. Rubenstein, O'Connor & Hannan, P.A., Minneapolis, Minn., for defendant Farm House Foods Corp.

Hart Kuller, Winthrop & Weinstine, St. Paul, Minn., for defendant Berisford Capital Corp.

## MEMORANDUM TO ORDER APPROVING SETTLEMENT AGREEMENT BETWEEN PLAINTIFF–TRUSTEE AND DEFENDANTS FOOTHILL CAPITAL CORPORATION AND BERISFORD CAPITAL CORPORATION

GREGORY F. KISHEL, Bankruptcy Judge.

On June 15, 1988, this Court entered an order in this Chapter 7 (converted from Chapter 11) case and these adversary proceedings, granting the motion of Debtor's Chapter 7 Trustee for approval of a compromise and settlement of the claims in litigation in these adversary proceedings against Defendants Foothill Capital Corporation ("Foothill") and Berisford Capital Corporation ("Berisford"), and overruling the objection of the remaining defendant, Farm House Foods Corporation ("Farm House"), to the settlement. This memorandum is entered to set forth a more detailed discussion of the factual and legal basis of that order. It supplements the *precis* of the decision read onto the record on June 13, 1988.

### I. PROCEDURAL POSTURE OF PRESENT MOTION.

Before it went into bankruptcy, Debtor was a St. Paul-based grocery wholesaler servicing a large area of Minnesota, Wisconsin, and Michigan. Debtor's Chapter 11

case was commenced when a number of its creditors filed an involuntary Chapter 7 petition against it on January 29, 1986. Debtor voluntarily converted the case to one for reorganization under Chapter 11 later that day. The stormy beginning of the case presaged nearly two years of intense conflict in numerous judicial proceedings involving Debtor, its secured creditors, its Unsecured Creditors Committee, and various shifting alliances among them. Former Chief Judge John J. Connelly was assigned to the case and presided over it until his retirement in late 1986. Foothill and Berisford were Debtor's major pre-petition secured creditors. Debtor scheduled Foothill's claim at $7,760,406.85. Debtor did not initially schedule Berisford's claim, though early in the case Berisford filed a proof of claim evidencing a debt in the amount of $1,800,000.00. Both creditors asserted liens and security interests against all of Debtor's assets, real and personal.[1] The first five months of the case were marked by two ongoing developments, which had a synergistic effect. First, Foothill increasingly resisted—and finally refused to consent to—Debtor's proposed use of Foothill's and Berisford's cash collateral for large-scale inventory replacement and other operating expenses. Second, Debtor's actual prospects of reorganization as a going concern withered, as a result of the depletion of its inventory, the loss of several major Twin Cities-area customers, and the severe shrinkage of its market share in its three-state arena of operations.

A single event during the unfolding of these matters indelibly altered the complexion of this case, particularly after its later entry into a "liquidation mode." Via a

March 11, 1986 order conditioning Debtor's use of cash collateral, Judge Connelly granted to Foothill and Berisford a replacement lien in *all* of Debtor's post-petition property, specifically including all net recoveries in contemplated adversary proceedings for avoidance of preferential transfers under 11 U.S.C. § 547.[2] As the depletion of Debtor's inventory accelerated in the spring and early summer of 1986, the makeup of Foothill's and Berisford's collateral shifted heavily toward Debtor's accounts and notes receivable, and the intangible causes of action wielded by Debtor only as a result of its status as a petitioner in bankruptcy.

By the time of the hearing conducted by Judge Connelly on July 9, 1986, all parties recognized that Debtor could no longer profitably operate its business. Foothill and Berisford refused to authorize a continuation of Debtor's use of their cash collateral. The three parties finally agreed that Debtor would liquidate its remaining personal property assets. In an August 21, 1986 order, Judge Connelly authorized Debtor's voluntary sale of its remaining personal property assets, accounts and notes receivable, and miscellaneous other property to C.O.M.B., Inc., a liquidator. Debtor's consummation of that order terminated its remaining, small-scale grocery wholesaling operations. The only "business" activity which Debtor thereafter conducted was the piecemeal rental to third parties of various portions of its warehouse facilities. In all other respects, Debtor had been transformed into a mere instrumentality for the advancement of various legal causes of action. On January 8, 1988, this Court entered an order granting the motion

---

1. Both creditors now note, and the Trustee stipulates, that they were fully secured when this case was commenced. Judge Connelly previously had concluded this as a matter of law. *See* Memorandum to Order denying motion of Foothill and Unsecured Creditors' Committee for relief from stay and vacation of cash collateral order, BKY 3–86–256, at 10 (filed May 22, 1986).

2. Foothill, Berisford, and the Unsecured Creditors' Committee all appealed this Order. On appeal, the District Court (Alsop, C.J.) determined that further analysis was required under

*In re Briggs Transportation Co.,* 780 F.2d 1339 (8th Cir.1985) and *In re Martin,* 761 F.2d 472 (8th Cir.1985), and remanded the matter for further proceedings. *In re Hancock–Nelson Mercantile Co., Inc.,* 3–86–CIV 238 (D.Minn. June 3, 1986). Judge Alsop noted that Judge Connelly's March 11, 1986 order had only authorized use of cash collateral through June 30, 1986. At a June 25, 1986 hearing on the remand, Judge Connelly addressed the proferred issues and authorized Debtor's use of cash collateral until a hearing set for July 9, 1986.

of Debtor's Unsecured Creditors Committee to convert this case to one for liquidation under Chapter 7.[3]

Debtor commenced these two adversary proceedings for avoidance of fraudulent transfers and equitable subordination by filing complaints on July 9, 1986. Debtor's original complaint in ADV 3–86–165 named only Foothill as a party defendant.[4]

In its original complaints, Debtor prayed for relief against Foothill and Berisford in the form of an avoidance of those creditors' security interests against Debtor's assets and a subordination of their claims to those of all other creditors. It cited the Minnesota enactment of the Uniform Fraudulent Conveyance Act, former MINN.STAT. §§ 513.20—.32, and 11 U.S.C. § 510(c), as authority. In an August 8, 1986 order in ADV 3–86–166, Judge Connelly essentially granted Berisford an indefinite extension of its deadlines for answer and for filing of a motion for withdrawal of reference, subject to termination of the extension at Debtor's option upon a demand for answer. There has been no active litigation in the Berisford proceeding and, but for the negotiations for comprehensive settlement, it has lain dormant.[5]

In an amended complaint in ADV 3–86–165 filed on August 8, 1986, Debtor added several factual allegations and expanded its legal theory to include 11 U.S.C. § 548.[6] In response to the amended complaint,

Foothill brought on a motion for summary judgment, basically arguing that Debtor could not possibly prove that Foothill had received less than a reasonably equivalent value (in the form of its substantial pre-petition advance of credit to Debtor) for Debtor's pre-petition grant to Foothill of a blanket lien. Judge Connelly conducted an informal hearing on this motion, in chambers and off the record, on October 6, 1986. The lack of a formal record hampers any precise determination as to the disposition which he made at that time. Participating counsel acknowledge that he denied the motion but ordered Debtor's counsel to file an amended complaint. However, in a written order entered on the motion on October 8, 1986, Judge Connelly rescinded his informally-made denial of Foothill's motion for summary judgment and continued the motion generally, pending re-calendaring by Foothill for a formal hearing.

On October 17, 1986, Debtor's counsel filed a second amended complaint, now joining Farm House as a defendant. Debtor again prayed for avoidance of fraudulent transfers and subordination of both Defendants' claims under the previously-cited statutory authorities, and added a broadly-phrased cause of action against Foothill for "bad faith" and one against Farm House for breach of an asserted corporate shareholder's fiduciary duty to creditors of the corporation. Foothill thereafter renewed

3. All references to "Plaintiff" in any discussion of the procedure or substance of this adversary proceeding shall signify Debtor—as a Chapter 11 debtor in possession wielding the powers of a trustee under 11 U.S.C. § 1107(a)—for all dates on or prior to January 8, 1988, and shall signify Michael J. Iannacone, in his status as Chapter 7 Trustee, for all dates after January 9, 1988.

4. Debtor's Chapter 11 counsel now alleges that he and his firm framed the allegations and prayers for relief in the original complaints somewhat hastily, and that that haste was occasioned by a tactical decision to quickly commence this litigation in response to an anticipated "showdown" over cash collateral issues at the scheduled July 9, 1986 hearing. He avers that all parties to these adversary proceedings—and all major parties in interest to the Chapter 11 case—were fully aware from the very beginning of the case that Debtor would prosecute major fraudulent-conveyance litigation against

several creditors and other entities including Farm House. Other counsel do not contest this statement. It bears much facial credibility, when considered against the backdrop of this case and the events leading up to it.

5. As a result, all references to specific pleadings and proceedings in this memorandum shall be to those in ADV 3–86–165.

6. Berisford suddenly appeared as a co-plaintiff in the caption and body of this first amended complaint, for the first and, thus far, only time. It has not appeared as a complainant against any party defendant in ADV 3–86–165, via pleading or court proceeding, since then. The later filing of a second amended complaint deleting it and its claims as co-plaintiff would otherwise leave matters in ambiguity, so the Court concludes that Berisford has abandoned the causes of action asserted in the first amended complaint.

its motion for summary judgment before the undersigned. The record on that motion was completed in late December, 1986. The Court deferred decision upon later advice from counsel that Debtor and Foothill were engaged in settlement negotiations.

Those negotiations resulted in a stipulation of settlement as between Debtor and Foothill, which was presented to the Court via motion filed on April 10, 1987. At an April 29, 1987 hearing on the motion, Debtor's Unsecured Creditors Committee and Farm House both strenuously objected to the terms of settlement. The Court deferred decision on that motion pending decision on the Unsecured Creditors Committee's subsequent motion to convert the case. After conversion of the case, Debtor's newly-appointed Chapter 7 Trustee requested an opportunity to review the terms of settlement and to either ratify or reject them. Renewal of settlement negotiations between the Trustee and Foothill has resulted in the stipulation of settlement presented on the motion at bar. Its terms are substantially different from those negotiated one year earlier by Debtor's Chapter 11 counsel. Farm House is not a party to the proposed settlement and has again strongly objected to it. No other party in interest has objected.

## II. FACTUAL BACKDROP OF ADVERSARY PROCEEDING AND PROPOSED SETTLEMENT.

Debtor based its complaint against Foothill and Farm House upon a series of transactions and events which took place in 1984–86. These factors surround and involve a "leveraged buyout"[7] of Debtor and several other regional grocery wholesalers, and the corporate restructurings which took place during and after the financial transactions. The parties do not dispute the actual occurrence of certain basic events, as to the changes in the ownership of Debtor and the other companies involved in the leveraged buyouts; changes in the structural relationships of those parties; certain basic exchanges, consisting of Foothill's advances of loaned funds to Debtor and Debtor's corresponding grants of liens to Foothill; and, generally, Debtor's subsequent disposition of those funds. The parties sharply controvert a number of other relevant facts, including the awareness, motivation, and intent of parties to the leveraged buyouts and their related transactions; the fiscal backdrop to the transactions—specifically, Debtor's and the related companies' solvency, value, and actual cash flow before and after the transfers; the actual benefit derived from the leveraged buyout and related transactions by Debtor and other related parties; and numerous other factors. It goes without saying that the parties also have monumental disagreements over the legal import of all of the events and transactions.

The basic, uncontroverted events are the following: Prior to January 17, 1985, Farm House was the sole shareholder in four large grocery wholesalers doing business in the upper Midwest: Hancock–Nelson Foods (operating from St. Paul, Minnesota, and serving central and southern Minnesota for over 70 years); Carpenter Cook Company (operating in the Upper Peninsula of Michigan); Roberts Farm House Foods Corporation (operating in western and central Wisconsin); and Farm House Wholesale Corporation (operating in eastern Iowa).[8] In late 1984 Farm House began negotiations for the sale of the capital stock of one or more of the four Farm House subsidiaries to Syncom Corporation, a holding company based in Miami Lakes, Florida, whose principals were Martin Panich and Kenneth Thenen. As of January

---

**7.** "A leveraged buyout is not a legal term of art. It is a shorthand expression describing a business practice wherein a company is sold to a small number of investors, typically including members of the company's management, under financial arrangements in which there is a minimum amount of equity and a maximum amount of debt. The financing typically provides for a substantial return of investment capital by means of mortgages or high risk bonds, popularly known as 'junk bonds.'" *United States v. Tabor Court Realty Corp,* 803 F.2d 1288, 1292 (3d Cir.1986).

**8.** Collectively "the Farm House subsidiaries," though this reference shall be to the four companies *prior to* their ultimate merger into the entity that was the debtor in this case.

17, 1985, Syncom owned all of the stock in Coordinated Foods Companies, Inc. ("Coordinated"). Coordinated was the ultimate named purchaser of the stock of the Farm House subsidiaries, apparently as an assignee of Syncom's rights of purchase.

On January 17, 1985, Farm House, Syncom, and Coordinated entered a stock purchase agreement for all four of the Farm House subsidiaries. Pursuant to the agreement, the buyer and purchaser(s) conducted two sale closings in early 1985, one on January 17 and the other on April 19. In the first closing, Debtor entered a loan agreement with Foothill, under which Foothill advanced $7,000,000.00 to Coordinated and, in return, received security interests and liens against all of the assets of Hancock–Nelson Foods. As part of the first closing, Farm House transferred its stock in Hancock–Nelson Foods to Syncom. Syncom then assigned its rights in the purchase to Coordinated. There is no probative evidence before the Court as to the specific immediate disposition of the loan proceeds, though there is no dispute that Hancock–Nelson Foods received little or none of them. Farm House was of course the ultimate recipient of the funds loaned, or at least of the benefit of the purchase price.

At the second closing, a total of approximately $8,600,000.00 passed hands for Farm House's sale of the stock of the three remaining Farm House subsidiaries, of which Foothill nominally furnished approximately $6,600,000.00[9] and Berisford advanced $2,000,000.00. The additional advance was evidenced by an amendment of the original loan documents. Foothill paid a substantial portion of the purchase price directly to Farm House. Liens and security interests in all of the assets of the other three Farm House subsidiaries were granted to Foothill and Berisford to secure repayment of the loans. Farm House transferred its shares in the other three Farm House subsidiaries to Coordinated. Then or shortly thereafter, Coordinated caused a merger of the other three companies into Hancock–Nelson Foods, where they became "operating divisions" of the main enterprise which continued to be headquartered in St. Paul. This merged company was the one which later filed for Chapter 11 relief.

Within several months after the second closing, Debtor began to experience substantial cash-flow difficulties. At some point soon after the loan/sale closings, Foothill demanded that Debtor turn over all proceeds of the collection of its accounts receivable as Debtor received them. Debtor acquiesced. Foothill then undertook to advance additional sums to Debtor for operating capital, using a "lending formula" premised upon the amount of current collections.

The grocery wholesaling business as it is currently conducted is a so-called "high-volume, low-margin" operation, relying on rapid payment of invoices at both retailer-wholesaler and wholesaler-trade supplier stages. Increasing numbers of Debtor's trade suppliers put it onto a "C.O.D." basis in the later fall or 1985, probably as a result of persisting and increasing delays in its payment to them. Numerous unpaid trade-supplier accounts accruing during this period survived to become unsecured claims scheduled by Debtor in its bankruptcy case; the claims exceeded 1,800 in number. By applying its "lending formula," Foothill obtained a reduction of Debtor's debt to it in the amount of more than $9,000,000.00 from November, 1985 until the commencement of this case.

### III. SUMMARY OF PLAINTIFF'S SECOND AMENDED COMPLAINT.

Plaintiff's second amended complaint contains 42 separate factual allegations, some of which are summarized *supra* as undisputed basic facts and the remainder of which are actually or potentially disputed. It also contains seven different counts, each of which incorporates the factual allegations as a basis for a different type of legal relief under fraudulent con-

---

**9.** This entire sum apparently was derived from a participation by Maryland National Industrial Finance Company, and not from Foothill's own funds.

veyance, equitable subordination, and general equitable theories.

Plaintiff premises its legal theories and requests for relief on the injury to Debtor and its general creditors which it alleges occurred during two different sequences of events and transactions. The first sequence consisted of the negotiation, structuring, and consummation of the leveraged buyout by Farm House, Foothill, Berisford, and other non-joined parties. The second sequence consisted of Foothill's enforcement of its secured rights, between the consummation of the leveraged buyout and the date on which Debtor's bankruptcy case was commenced.

Plaintiff sought relief against both Farm House and the secured lenders under fraudulent conveyance theories. In Counts I, II, and III, it broadly alleged that the "transfers" of Debtor's assets occurring during *both* the first and second sequences were avoidable fraudulent conveyances under the "constructive fraud" provisions of the Minnesota enactment of the Uniform Fraudulent Conveyances Act, former MINN.STAT. § 513.23—.25. Under these counts, Plaintiff claimed that the "transfers were made without fair consideration," and:

I. they either were made while Debtor was insolvent, or made Debtor insolvent by themselves (per former MINN.STAT. § 513.23);

II. they were made with knowledge that they left Debtor with an unreasonably small amount of capital with which to engage in business (per former MINN.STAT. § 513.24); and

III. they were made with knowledge that the debts incurred would be beyond Debtor's ability to repay as they matured (per former MINN. STAT. § 513.25).

None of the relevant statutory provisions require Plaintiff to prove that any partici-

pant in the two sequences acted with actual intent to defraud Debtor's other creditors.

In Count IV, Plaintiff requested the same relief under 11 U.S.C. § 548, the Bankruptcy Code's fraudulent-conveyance provision, asserting a theory parallel to the state-law theory of Count I.

In Count V, Plaintiff requested that both Farm House's and Foothill's claims be subordinated to those of all of Debtor's other creditors, on the basis of both sequences of events, and pursuant to 11 U.S.C. § 510(c) and general equitable principles.

In Count VI, Plaintiff requested an award of damages in the sum of $17,000,-000.00 as against Foothill alone, apparently on the basis of both sequences of events and under a generalized legal theory of "bad faith" and "reckless disregard towards the health of the business and the rights of other creditors."

In Count VII, Plaintiff requested an award of damages in the same sum as against Farm House alone, apparently as a result of the first sequence alone, and under the theory that Farm House had breached a controlling shareholder's fiduciary duty to the corporation and its general creditors.

## IV. TERMS OF PROPOSED SETTLEMENT.

The proposed settlement now before the Court provides for the following:

1. Acknowledgment by all parties that Debtor's Chapter 7 estate consists solely of the following:

 a. One Million Sixty–Four Thousand Eight Hundred Eighty-one Dollars 74/100 ($1,064,881.74) in cash on deposit;

 b. Debtor's St. Paul warehouse and office facility; [10]

 c. Causes of action for avoidance of preferential transfers against approximately 290 entities.

 d. Cause of action in ADV 3–86–165 against Farm House;

---

**10.** On June 8, 1988, the Court entered an order approving the sale of this overencumbered asset, in a transaction which will not directly or indirectly provide funds to the estate unless the

Court grants a pending motion for avoidance of a mortgage securing a $260,000.00 debt alleged to be the result of an impermissible post-petition transaction.

e. Other, undescribed "miscellaneous legal causes of action and real property."

2. Acknowledgment that Foothill and Berisford held fully-secured claims against all of the assets presently in the estate as of January 1, 1987.

3. Retention by Foothill and Berisford of their liens and security interests against all of the assets of the estate until their claims are paid in full.

4. Allocation and payment of cash estate assets on hand, and all cash assets or proceeds garnered into the estate in the future, as follows:

| Incremental Amount | Recipient |
| --- | --- |
| First $250,000.00 | Escrow account for Chapter 7 Estate's payment of allowed administrative-expense claims. |
| Then, by increments: | |
| $1,000,000.00 | Foothill/Berisford |
| $1,000,000.00 (less balance of administrative-expense fund as of closing of estate) | Chapter 7 Estate |
| $1,100,000.00 | Chapter 7 Estate (50 percent) and Foothill/Berisford (50 percent) |
| $3,900,000.00 | Chapter 7 Estate (40 percent) and Foothill/Berisford (60 percent) |
| All further monies recovered. | Chapter 7 Estate (60 percent) and Foothill/Berisford (40 percent) |

5. Full release of Foothill and Berisford from liability to the estate arising out of all transactions between Debtor and Foothill and Berisford prior to May 25, 1988, and full satisfaction of the fraction of the total amount of damages suffered by Debtor and/or the estate which was occasioned by the causal fault of, or which was the responsibility of, Foothill and Berisford.

6. Indemnification of Foothill and Berisford by the Trustee from any claims for contribution and/or indemnity by any other persons or entities adjudged jointly and/or severally liable with them for damages to Debtor and/or the estate, with the same effect as a *"Pierringer* release."

7. Reservation to the estate of all other causes of action which the estate has or may have against all other persons or entities, specifically against Farm House "for having caused, directed or aided the actions of" Foothill and Berisford.

8. Withdrawal of all allegations or assertions of fraud against Foothill and/or Berisford.

9. Obligation of the Trustee to "diligently pursue" the estate's claims against Farm House, and obligation of Foothill and Berisford to provide non-privileged information and non-privileged deposition testimony for this action without necessity of subpoena to the Trustee, at the estate's expense.

10. Voiding and nullification of the first settlement agreement and release presented to the Court.

Not surprisingly, Farm House strenuously objects to the settlement agreement. In support of its objection, it makes one procedural argument and three substantive arguments. Procedurally, it argues that the proponents of the settlement have not made an adequate record upon which this Court can evaluate the propriety of its terms, and cannot do so. Substantively, it argues that the terms of the stipulation are "inequitable and ... not in the best interests of the estate"; that the stipulation inappropriately embodies the form and conceptual basis of a *"Pierringer* release" and purports to produce its effects, in a dispute which does not involve principles of comparative negligence; and that its indemnification provisions and its obligation to diligently pursue the surviving counts of these adversary proceedings impermissibly limit and hamper the Trustee's discretionary authority to administer assets of the bankruptcy estate. Farm House's objections are impressively and articulately presented —but, ultimately, unavailing.

## V. DISCUSSION.

### A. STANDARD FOR REVIEW OF COMPROMISE OR SETTLEMENT.

In considering pursuant to BANKR.R. 9019 a proposed compromise or settlement

of a controversy to which a bankruptcy estate is a party, the Bankruptcy Court must consider several factors, and weigh them against one another. The factors are:

1. The probability of success in the litigation;

2. The difficulties in collection of any litigated judgment;

3. The complexity of the litigation and the expense, inconvenience, and delay necessarily attending it;

4. The paramount interests of creditors; and (in appropriate cases)

5. Whether conclusion of the litigation promotes the integrity of the judicial system.

*Drexel v. Loomis,* 35 F.2d 800, 806 (8th Cir.1929); *In re Lakeland Dev. Corp.,* 48 B.R. 85, 89–90 (Bankr.D.Minn.1985); *In re Hanson Industries, Inc.,* 88 B.R. 942, 946 (Bankr.D.Minn.1988). The paramount (though not ultimately controlling) consideration is the interests of creditors of the estate. *In re Flight Transportation Corp. Securities Litigation,* 730 F.2d 1128, 1135 (8th Cir.1984).

Approval or disapproval of a proposed settlement involving a bankruptcy estate is committed to the discretion of the trial court. *In re Flight Transportation Corp. Securities Litigation,* 730 F.2d at 1135; *Van Horn v. Trickey,* 840 F.2d 604, 607 (8th Cir.1988) (applying abuse-of-discretion standard on appeal).[11] *See also In re Woodson,* 839 F.2d 610, 620 (9th Cir.1988); *In re American Reserve Co.,* 841 F.2d 159, 162 (7th Cir.1987). In exercising that discretion, however, the Bankruptcy Court must make an "informed, independent judgment." *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968), *reh. denied,* 391 U.S. 909, 88 S.Ct. 1649, 20 L.Ed.2d 425 (1969). (*"TMT Trailer Ferry"*) [citing *National Surety Co. v. Coriell,* 289 U.S. 426, 436, 53 S.Ct. 678, 681, 77

L.Ed. 1300 (1933)]. The Supreme Court has cautioned:

There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.

*TMT Trailer Ferry,* 390 U.S. at 424–25, 88 S.Ct. at 1163. If it approves a controversial settlement, the Bankruptcy Court must justify its actions on the basis of "well-reasoned conclusions arrived at after a comprehensive consideration of all relevant factors." *TMT Trailer Ferry,* 390 U.S. at 434, 88 S.Ct. at 1168. It cannot make a "mere boilerplate approval phrased in appropriate language but unsupported by evaluation of the facts or analysis of the law." *Id.*

Farm House has framed its four objections to the proposed settlement using the substantive and procedural dictates of these authorities.

## B. FARM HOUSE'S FIRST OBJECTION: ADEQUACY OF RECORD SUPPORTING SETTLEMENT.

■ While Farm House's counsel did not separately enumerate it in brief and argument, Farm House makes an initial objection to the proposed settlement which does not go to its merits, but rather to the procedural and evidentiary basis on which the settling parties present it to the Court. Basically, Farm House argues that the

---

**11.** *Van Horn v. Trickey* was a civil class-action suit, not a proceeding in a bankruptcy case. The Eighth Circuit cited *Flight Transportation* in the *Van Horn* opinion for this proposition, obviously analogizing the role and duty of a named class-action plaintiff with that of a trustee in bankruptcy. The analogy is apt, given the similar configuration of parties to the litigation.

Court lacks a sufficiently-developed record of evidence upon which it may determine whether the proposed settlement is in the best interests of creditors and the estate. It then argues that, as a result, any approval by this Court will not be founded upon the extended analytic process required by *TMT Trailer Ferry.*

In support of this argument, Farm House summarily asserts that "the entire record points to the greater liability of Foothill [in Debtor's downfall] rather than Farm House." However, to support this assertion, it presents only a smattering of scattered documents gleaned from discovery responses. Many of these documents do not even go to the relevant transactions, but only to similar transactions with entities not joined in these lawsuits, in which Foothill concurrently engaged. Counsel advise the Court that the initial round of Plaintiff's document discovery generated approximately 100,000 individual items. The parties have (perhaps mercifully) not filed or submitted any of the fruits of this or any other discovery, other than the few presented by Farm House. The Court is left with a record consisting of the filed pleadings, relevant pleadings and orders in Debtor's main bankruptcy case file, and the record made at the hearing on the matter at bar. The lack of formal evidence does indeed prohibit any conjecture as to which party's version of the facts is closer to "the truth." The Court is not able to determine with any precision whether either side will be able to adequately support its legal arguments with probative evidence.

This acknowledgment need not stymie the evaluation of the proposed settlement, however. The unique posture of the bankruptcy estate and the parties allow this Court to fully evaluate the benefit of the proposed settlement to the bankruptcy estate, and to approve it, without engaging in a thoroughgoing analysis of the weight of any prospective evidence. This conclusion springs from the recognition of two undeniable characteristics of the parties' present posture.

1. *The Practical Need for the Estate to Deal With Foothill and Berisford.*

At the present time Foothill and Berisford have a lien against *all* of the assets of this bankruptcy estate, with the possible exclusion of the causes of action in these adversary proceedings. Plaintiff has advised the Court that the anticipated value of *all* estate assets other than these causes of action does not exceed the sum of $2,250,000.00. The unsatisfied portion of Foothill's and Berisford's claims exceeds that sum by a considerable margin, possibly as much as $4,750,000.00.[12] Plaintiff does not hold or control any unencumbered assets from which he could pay the expenses of administration of the estate—*including the costs, expenses, and attorney fees incurred in the litigation of these adversary proceedings.* Since Plaintiff sued them, Foothill and Berisford have repeatedly and tenaciously objected to the use of their collateral to finance an attack on their own secured position. While this case was under Chapter 11, the Court did authorize Debtor to use proceeds of that collateral to pay Debtor's attorney fees incurred in these adversary proceedings. However, it did so on a finding that the secured creditors had impliedly consented to that action at an earlier stage in the case. *See* Memorandum to Orders of July 14 and 15, 1987, at 17–20, BKY 3–86–256 (filed August 4, 1987); Orders on Interim Fee Applications of Fredrikson & Byron, P.A., and Wagner, Johnston & Falconer, BKY 3–86–256 (both November 14, 1986). Now that this case is pending under Chapter 7, and a party explicitly and solely charged with the liquidation of the assets of a defunct corporation is the party-plaintiff in these adversary proceedings, it is no longer defensible to infer that continuing consent.

Plaintiff thus is now faced with three stark realities of his power to administer

---

**12.** The settling parties have stipulated that as of January 1, 1987, Foothill's and Berisford's claims were fully secured. No new assets have come into the estate since then. From before that date until the approval of this settlement, Foothill and Berisford received no distribution from the estate on account of their secured claims.

this estate. First, he cannot pay the necessary expenses of the liquidation of the present causes of action—or of any other asset of this estate—without the secured creditors' consent, or without an avoidance of their liens by this Court. Second, the secured creditors have stated unequivocally that they will not give that consent, with no strings attached. Third, the only way by which Plaintiff may obtain an avoidance of the liens on the estate is through months or years of complex litigation against implacable and well-funded opponents—without having monies to fund his own end of the litigation.

Plaintiff thus had only two alternatives: to abandon all of the assets in the estate to the secured creditors, forgoing *any* prospect of distribution to unsecured claimants; or to deal with the secured creditors to arrive at a working arrangement which would both benefit the estate and advance the secured creditors' interests. He has done the latter. While Farm House has characterized the resultant bargain as something tantamount to a Faustian "deal with the devil," that characterization is only arguable if one views this adversary proceeding in a vacuum. Against the backdrop of the estate's overall position, the proposed settlement is revealed as something more in the nature of a necessary evil, the inevitable product of early post-petition developments now beyond the possibility of alteration, whose ultimate substantive merit must be measured by its internal characteristics.

### 2. The Estate's Necessary Assessment of Litigation Risks on Its Various Causes of Action.

Farm House does not acknowledge that Plaintiff's claims against the defendants in these adversary proceedings spring from two different matrices of legal theory, as a necessary result of the different relationships which each defendant had with the Farm House subsidiaries and Debtor before, during, and after the leveraged buyout.

Ultimately, Plaintiff's cause of action against Farm House is founded on the state-law equitable principle that the shareholders of a corporation are deemed to hold their interests in trust for the benefit of bona fide creditors of the corporation, and that shareholders' claims to the value of the corporation are subordinate to those of the corporation's creditors. *See, e.g., Erickson–Hellekson–Vye Co. v. A. Wells Co.,* 217 Minn. 361, 374, 15 N.W.2d 162, 170 (1944); *First Nat'l Bank v. Gustin Minerva Mining Co.,* 42 Minn. 327, 332, 44 N.W. 198, 200 (1890); *Honn v. Coin & Stamp Gallery, Inc.,* 407 N.W.2d 419, 422 (Minn. App.1987); *B & S Rigging & Erection, Inc. v. Wydella,* 353 N.W.2d 163, 168 (Minn. App.1984). *See also* MINN.STAT. c. 302A.753. This theory is more well-defined and somewhat simpler under the current state of corporate- and debtor-creditor law.

On the other hand, Plaintiff's cause of action against Foothill and Berisford arises out of the secured creditors' participation in the allegedly predatory leveraged buyout, and from their alleged subsequent manipulation of Debtor and its assets to obtain a rapid pre-petition reduction in Debtor's debt to them. These causes of action are in part based upon the so-called *"Gleneagles"* cases, which first held that a lender financing a leveraged buyout of a subsequently-failing company may be determined to have been the recipient of a fraudulent conveyance at the expense of the company's general creditors. *See* substantive discussion of *Gleneagles* cases *infra* at 993–95.

One can safely say that these cases, and the implications of their theory, are at the frontiers of current debtor-creditor and bankruptcy law. The general scope of the *Gleneagles* rationale is by no means clear, and its applicability in various factual contexts (including the present one, which has some differences from that in *Gleneagles*) is wholly uncertain. To date, the Eighth Circuit has not been called upon to consider the *Gleneagles* holding, and it cannot be said to be binding precedent in this Court. By contrast with the theory asserted against Farm House, Plaintiff's cause of action against Foothill and Berisford is subject to a much greater litigation risk—because it presents questions which are

either of first impression or which invoke a legal theory still in the very early stages of its evolution. This circumstance is significant enough that it, too, militates in favor of considering the merits of the proposed settlement without an exhaustive review of probative evidence which may be elicited at trial.

■ Thus, this Court can address the propriety of the proposed settlement based upon the utility of the settlement to the bankruptcy estate, and the risks which the estate would otherwise incur in litigating under the theories advanced against the settling defendants. More directly stated, the more a controversy in litigation by a bankruptcy estate involves complex facts and novel theories of law, the less thoroughgoing a factual record is required before a Bankruptcy Court may approve a stipulation which appears on its face to substantially benefit the estate.

The settlement has obvious immediate utility to the bankruptcy estate (by freeing assets for the payment of administrative expenses for this and other proceedings) as well as long-term utility (by finally resolving the troublesome status of Foothill's and Berisford's pre- and post-petition liens against the estate's assets, and the effect of those liens on other creditors' claims and the ongoing administration of the estate). The record presented is sufficient to permit the Court to weigh the internal merits of the settlement, and to conclude that the settlement is in the best interests of the estate from these administrative and tactical perspectives. Whether the proposed settlement is advisable in light of the balancing analysis between the chance of success on the merits and the present value of the settlement is appropriately considered under Farm House's first substantive objection.

## C. FARM HOUSE'S SECOND OBJECTION: BENEFIT TO BANKRUPTCY ESTATE FROM PROPOSED SETTLEMENT.

■ In its first—and major—substantive objection, Farm House argues that applica-

tion of the *Drexel v. Loomis* factors mandates a conclusion that the proposed settlement is not in the best interests of the bankruptcy estate. Farm House asserts that the settlement relinquishes a valuable asset of the estate, without producing any discernible benefit in the form of savings in the expense of litigation, a net payment to the estate in settlement, or anything else. Farm House also argues that Plaintiff has not adequately explained why the estate is now settling its litigation against Foothill and Berisford, when (prior to conversion of the case) Debtor repeatedly, loudly, and vigorously asserted the merit of the lawsuits.

As a preliminary step, some discussion of Plaintiff's theories of action against the secured lenders is appropriate. In the second amended complaint, Plaintiff describes the events and transactions summarized in Part II of this memorandum, and asserts that none of the Farm House subsidiaries ever received any of the proceeds of the loans from Foothill; that the loan proceeds were passed through the subsidiaries to Coordinated and Syncom; and that Foothill and Syncom used the passed-through funds to pay Syncom's and other Syncom subsidiaries' debts to Foothill and other creditors. Plaintiff also charges that for ten months before the commencement of Debtor's Chapter 11 case, "Foothill had absolute control of [Debtor's] money," "determined how [Debtor] paid its suppliers," and knowingly manipulated Debtor through use of its "lending formula" to obtain repayment of its own debt while aware of the "likely consequence on [Debtor's] future." When read together, these factual allegations and Counts I through IV of the second amended complaint essentially characterize as fraudulent conveyances both the initial creation of Foothill's and Berisford's all-encumbering liens, and Foothill's later application of Debtor's cash flow to the satisfaction of its debt.

The proposition that a lender financing a leveraged buyout could be held culpable as the recipient of a fraudulent conveyance was first established in the groundbreaking case of *United States v. Gleneagles Investment Co., Inc,* 565 F.Supp. 556 (M.D.Pa.

1983) (commonly referred to as *"Gleneagles I"*), aff'd sub nom. *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir.1986).[13] *Gleneagles I* and *Tabor Court* arose out of the failed 1973 leveraged buyout of the then-largest producer of anthracite coal in the United States. The form of the transactions in *Gleneagles I* had many similarities to that involved here, though there were some significant differences in both the form and end-product of the leveraged buyout. The Internal Revenue Service and the trustee in bankruptcy of two of the operating subsidiaries of the failed debtor joined forces to challenge specific aspects of the leveraged buyout as conveyances which were fraudulent upon the pre-buyout trade, tax, and regulatory creditors of the failed company. They focused upon the failed company's grant of the mortgages which secured the financing for the leveraged buyout, and the receipt of the proceeds of the sale by the former shareholders, as the specific injuries to the third-party creditors. They invoked the Pennsylvania enactment of the Uniform Fraudulent Conveyances Act ("UFCA") as authority.

After weeks of trial, and on the basis of lengthy and detailed findings of fact, the United States District Court for the Middle District of Pennsylvania concluded that the transactions under which the secured lender structured the leveraged buyout, took its all-encumbering liens, and later enforced those liens did constitute an avoidable conveyance under both the "actual fraud" and "constructive fraud" provisions of the UFCA. *Gleneagles I*, 565 F.Supp. at 577 and 580, and 582–3. On the appeal by a successor-in-interest to the original secured lender, the Third Circuit affirmed. *Tabor Court*, 803 F.2d at 1295–7.

These decisions have been extremely controversial—calling into question, as they do, the validity and legality of a corporate financing tool which has been widely used in the tumultuous economy of the 1980's. The rationale of the decisions has been adopted and applied as persuasive authority,[14] judicially criticized,[15] and extensively discussed at continuing legal education seminars and in the scholarly literature.[16] At least one commentator has suggested that the conclusion in *Gleneagles I* and *Tabor Court* was fact- and even party-specific to the lawsuit which spawned the opinions. *See* Murdoch, *infra* at n. 16, 43 BUS. LAWYER at 19–20. Another pair of prominent academics have suggested that fraudulent conveyance law is almost invariably inapplicable to the complicated string of transactions encompassed in the modern leveraged buyout. Baird & Jackson, *Fraudulent Conveyance Law and Its Proper Domain*, 38 VAND.L.REV. 829 (1975). To the extent that *any* conclusion can be drawn about the viability of the *Gleneagles* holding in the present instance, it must simply be to characterize the *Gleneagles* holding as being on the very frontiers of present debtor-creditor and bankruptcy law. Its contours, extensions, and applicability are unclear at this early stage in the development of the theory. There

---

**13.** The litigation spawning these two opinions generated two other trial court opinions which are not directly applicable here: *United States v. Gleneagles Investment Co., Inc.*, 571 F.Supp. 935 (M.D.Pa.1983) (again commonly referred to as *"Gleneagles II"*) and *United States v. Gleneagles Investment Co., Inc.*, 584 F.Supp. 671 (M.D.Pa. 1984) (*"Gleneagles III"*). The major proposition of these cases has already become known in bankruptcy parlance as "the *Gleneagles* holding." For the purposes of this memorandum, *"Gleneagles"* shall refer to the trial court opinion in *Gleneagles I; "Tabor Court"* shall refer to the Circuit Court opinion cited in the text above.

**14.** *In re Ohio Corrugating, Inc.*, 70 B.R. 920 (Bankr.N.D.Ohio 1987); *In re Anderson Industries*, 55 B.R. 922 (Bankr.W.D.Mich.1985). *See* also *Telefest, Inc. v. VU–TV, Inc.*, 591 F.Supp. 1368 (D.N.J.1984).

**15.** *Credit Managers Ass'n of Southern Calif. v. The Federal Co.*, 629 F.Supp. 175 (C.D.Calif. 1985); *Kupetz v. Cont'l Ill. Bank & Trust Co.*, 77 B.R. 754 (C.D.Calif.1987).

**16.** *See, e.g.,* Murdoch, et al, *Leveraged Buyouts and Fraudulent Transfers: Life after Gleneagles*, 43 BUS.LAWYER 1 (1987); Kirby, et al, *Fraudulent Conveyance Concerns in Leveraged Buyout Lending*, 43 BUS.LAWYER 27 (1987); Carlson, *Leveraged Buyouts in Bankruptcy*, 20 GA.L.REV. 73 (1985); Carl, *Fraudulent Transfer Attacks on Guaranties in Bankruptcy*, 60 AM.BANKR.L.J. 109 (1986).

are no published decisions from either the District of Minnesota or the Eighth Circuit addressing the merits of the *Gleneagles* rule.

Recognizing, then, that the law governing Foothill's and Berisford's potential liability to fraudulent-conveyance attack is little-developed and quite unsettled, and that the estate's fraudulent-conveyance claims against the secured lenders would require major factual and legal development to present them for adjudication, the Court will address the *Drexel v. Loomis* factors.

### 1. *Probability of success in the Litigation.*

Consideration of the first *Drexel v. Loomis* factor principally requires the Court to balance the strength of the plaintiff's case on the merits against the amount offered in settlement. *Pfizer Inc. v. Lord,* 456 F.2d 532, 543 (8th Cir.1972) [ultimately quoting from *TMT Trailer Ferry,* 390 U.S. at 424–25, 88 S.Ct. at 1163–64]. Farm House's argument here is twofold.

First, it notes that Plaintiff previously asserted, in response to Foothill's motions for summary judgment, that the great strength of its causes of action against Foothill and Berisford mandated the full litigation of those claims to judgment. It argues that Plaintiff has not justified the estate's reversal of position in its election to settle with the secured lenders. The implication of the argument is that the estate should somehow be held to its earlier tendentious position, and should be forced to carry out its earlier threats.

Second, it claims that it has discovered substantial evidence that the estate's causes of action against Foothill and Berisford are meritorious, that Plaintiff would have a high probability of success against them were the claims fully litigated, and that successful litigation would recoup "the millions of dollars paid pursuant to [the secured lenders'] security interests, as well as other damages," to the estate.

These arguments cannot prevail, for two reasons. First, they ignore the estate's inability to fund the litigation absent this settlement—a circumstance which looms over the consideration of *any* substantive aspect of the settlement. Second, they inappropriately presuppose a certainty of proof, and this Court's ultimate adoption of the *Gleneagles* rationale.

The assertions made in this adversary proceeding by Debtor's Chapter 11 counsel before the conversion of this case were made in an entirely different phase of the administration of the estate and the development of this adversary proceeding. The estate was in a much more unstable, precarious, and uncertain position. To a certain extent, the assertions can be forgiven as lawyerly posturing, understandable under the pressures of pitched major litigation. Were all litigants in civil disputes to be held to their counsel's early diatribes, maledictions, and threats, civil lawsuits might never settle. The courts' dockets would be impossibly burdened, the practice of law would be wholly unmanageable, and the national wealth would be drained for the financing of intractable disputes.

Farm House suggests that that estate must now admit that its cause of action against the secured lenders was so without merit that it should never have put it into suit. The suggestion would make some sense, were the proposed settlement an abject surrender to Foothill and Berisford.[17] It is not. The proposed settlement immediately frees a fixed and substantial portion of the funds otherwise subject to the secured lenders' liens, for distribution to unsecured creditors. As such, it presupposes a certain outcome, were the various requests for relief fully litigated against the various defendants. Obviously, the Court cannot determine on the present state of the record whether a full-dress trial would inevitably result in the configuration of relief reflected by the settlement. However, *TMT Trailer Ferry* does not impose upon this Court the obligation to compel the full trial record, or the burden of

---

**17.** The proposed settlement in *TMT Trailer Ferry* seems to have been such a surrender. *See* 390 U.S. at 425, 88 S.Ct. at 1163. This may have influenced the strength with which the Supreme Court phrased its legal conclusions. *See also In re Woodson,* 839 F.2d 610, 620–21 (9th Cir.1988).

reviewing that record—or even the duty to conduct a "mini-trial." *In re American Reserve Corp.*, 841 F.2d at 163. All that is necessary is that the Court require the production of sufficient facts which would permit a reasoned judgment that a controversy should be settled under the terms proposed. *TMT Trailer Ferry*, 390 U.S. at 441, 88 S.Ct. at 1171. The bankruptcy judge "need only apprise himself of the relevant facts and law so that he can make an informed and intelligent decision, and set out the reasons for his decision." *In re American Reserve Corp.*, 841 F.2d at 163.

Plaintiff and his counsel have produced enough evidence going to the relevant facts supporting this settlement in the unusual circumstances presented here. In settling, they have deliberately but defensibly chosen to forgo the litigation risk of pursuing a cause of action which would require a difficult and extended process of proof, and would hinge on success in convincing the Court to adopt a legal theory as yet untested in this Circuit.

The proposed settlement does not embody "the virtual abandonment of all claims against Foothill and Berisford," as Farm House argues. Rather, it embodies a structured apportionment of relief to both Plaintiff and the secured lenders. The terms of settlement are based upon a hard-headed assessment of the relative strengths of the estate's positions against the secured lenders which suggested the reasonable likelihood of a particular outcome of the litigation. On the present record, one cannot conclude that the estate either would invariably win all of its claims against Foothill and Berisford, or that it would invariably lose all of them, were the litigation to proceed to judgment.

Solely on a consideration of the factual complexity and legal uncertainties of the litigation, one can readily conclude that the settlement embodies a position somewhere in the middle ground between the settling parties' respective positions. It essentially reaches the same result in estate distribution as if Plaintiff were to prevail against Foothill and Berisford on its fraudulent-conveyance claims, and to lose on its equitable subordination claims—whether one presupposes victory against Farm House or not. This result is a satisfactory mid-point between a total win and a total loss, taking the estate's significant litigation risk into account. The first *Drexel v. Loomis* factor augurs in favor of the proposed settlement.

### 2. Difficulties in Collection of Judgment.

Farm House acknowledges that the second *Drexel v. Loomis* factor has little relevance. The stipulation does not address whether Foothill and Berisford would be unable to satisfy a full grant of monetary relief to Plaintiff. One or more affidavits filed for the purposes of early motions in Debtor's Chapter 11 case would support a finding that Foothill had substantial assets and net worth in 1986. There is no evidence going to the secured lenders' present solvency. The parties apparently acknowledge that Foothill and Berisford could substantially or fully satisfy any judgment against them. This apparently is not a case where the application of the "bird-in-the-hand" principle would augur in favor of or against settlement.

### 3. The Complexity and Cost of Litigation.

Farm House bases its objection on the third *Drexel v. Loomis* factor on two aspects of the litigation. It notes that it has filed a cross-claim against Foothill for contribution and indemnity. The sixth aspect of the stipulation (noted at p. 989 *supra*) requires the Trustee to indemnify Foothill and Berisford from any such claims. Farm House accordingly argues that the settlement will not reduce the complexity of factual and legal issues to be joined, because it says the Trustee will have to defend its cross-claims. It asserts that the settlement will not reduce the anticipated delay and expense to the estate in obtaining final judgment.

This argument directly applies only as to one of the two sequences of events involved in Plaintiff's fraudulent-conveyance causes of action. Plaintiff asserts that Foothill and Farm House are both responsible for any fraudulent conveyance which took place upon the consummation of the

leveraged buyout, and thus are jointly and severally liable for any resultant damages. Plaintiff also seeks to hold Foothill solely liable for a fraudulent conveyance which occurred when it applied its "lending formula" to reduce the amount of Debtor's debt to it. The settlement releases *both* of these causes of action as to Foothill, and as to Berisford. Farm House cannot assert a right to contribution and indemnity from its co-defendants as to any cause of action arising out of the second sequence of events, as Plaintiff does not seek to hold Farm House liable for any injury arising out of it. Plaintiff's settlement of all causes of action arising out of the second sequence thus *does* reduce the complexity, delay, and expense of the direct litigation by some significant fraction; the estate will not have to develop evidence going to these factors as part of its case-in-chief, and may not have to address them at all.[18]

The same conclusion obtains as to the remaining claims on which Plaintiff sought to hold Foothill and Farm House jointly and severally liable. By releasing all causes of action against Foothill and Berisford arising from their direct role in the leveraged buyout and its consequences, the estate will be freed from the burden of developing an evidentiary and legal basis for these claims as part of its case in chief. The nature of the settlement as a *Pierringer* release will require that these claims be presented at trial.[19] However, the settlement shifts the burden of litigation on these issues to Farm House, which maintains that the secured lenders had a causative role in Debtor's downfall that either was exclusive, or was greater than its own. The estate must address and develop evidence on these matters, but it need do so only in a defensive posture. It thus may benefit from an initial framing of the issues by Farm House, and from the fact that Farm House will have to bear the initial financial burden of much of the discovery. The estate will save at least some time and expense as a result.

Farm House's whole argument on this point is something of a red herring. Were the argument credited, no bankruptcy court could approve a *Pierringer*-structured settlement of routine personal injury litigation to which a bankruptcy estate was a party. Neither the Supreme Court nor the Eighth Circuit reasonably could have intended such a result under the principles enunciated in *TMT Trailer Ferry, Drexel v. Loomis,* and *Flight Transportation.* In sum, the proposed settlement will result in a sufficient savings to the estate of the burdens of litigation so as to support its approval.

### 4. The Paramount Interests of Creditors.

 Under the final relevant *Drexel v. Loomis* factor,[20] Farm House cloaks itself in the guise of a righteous creditor[21] to

---

**18.** If Farm House interposes any injury resulting from the second sequence of events as an affirmative defense in the nature of a "supervening cause," the estate will still have to develop evidence on these events—but from the more advantageous stance of a defensive posture.

**19.** *See* more extended discussion at 999–1004 *infra.*

**20.** Farm House also raises a fifth factor—whether the settlement will promote the integrity of the judicial system—against the proposed settlement. The applicability of this factor—*in appropriate cases*—was suggested by Judge Robert J. Kressel of this Court in *In re Lakeland Development Corp.,* 48 B.R. at 90 and 92–3. While Farm House argues that the credibility of this Court and the federal system would be besmirched by the approbation of this settlement, the Court disagrees. This is an arms-length, hard-won settlement of claims which are not as unbeatable as Farm House alleges from its partisan position.

**21.** While Farm House alleges that the estate owes it money for certain post-petition obligations incurred during Debtor's Chapter 11 case, it has cannily attempted to avoid any action which could be characterized as an assertion of the status of "creditor" of or "claimant" against the estate. It has gone so far as to successfully move this Court for an order extending the deadline by which it must file a proof of claim. This exercise is prompted by a desire not to subject itself in this adversary proceeding to the "jurisdiction-by-ambush" provision of 28 U.S.C. §§ 157(b)(1) and 157(b)(2)(C), as it has brought on a motion for transfer of this litigation to the U.S. District Court based in part on the assertion that a bankruptcy judge lacks constitutional authority to hear and finally determine a fraudulent conveyance action brought by a trustee. While the

argue that the proposed settlement is not in the best interests of it and the 1,500–odd other claimants against the estate. It (not unreasonably) notes that maximizing the bankruptcy estate's collection of assets is always in the best interests of unsecured creditors, and then points to the fact that the proposed settlement does not provide for any direct cash payment by Foothill or Berisford into the estate. It also asserts that it is "wholly inequitable" for Foothill and Berisford to retain their liens against the estate's assets, and that Foothill's retention of funds it previously received and the secured creditors' contemplated receipt of a substantial portion of the estate's remaining assets "is grossly unfair to all other creditors."

This argument is all very noble, but it elides one crucial aspect of the settlement: its immediate functional utility to the estate. Months before the commencement of this adversary proceeding, Judge Connelly imposed liens for the benefit of Foothill and Berisford onto every post-petition asset which now remains in the bankruptcy estate. The stacking of the post- and pre-petition liens, and the severe shrinkage of the estate during the final frenzied months of Debtor's business operation, combined to give Foothill and Berisford a throttle-hold over the estate and, ultimately, this litigation. Exercising hindsight, one may question the wisdom of the contribution to that advantage which resulted from the adequate protection order. However, everyone now involved in this litigation must deal with it, the Court included. Foothill's and Berisford's liens are valid and enforceable until avoided by this Court. The only vehicle for avoidance of those liens is the present litigation. The estate has no otherwise-unencumbered assets with which to fund this litigation. In essence, the estate is to a sizeable extent hamstrung.[22]

This is where the functional utility of the settlement becomes apparent. Simply stated, it gives the estate lifeblood which it would lack otherwise. In freeing up an administrative-expense fund for use in this litigation, it restores Plaintiff to a degree of independence in pursuing the litigation against the surviving defendants. In objecting, Farm House is obviously and cannily aware of the estate's inability to even function over Foothill's and Berisford's resistance. Its objection to this settlement seeks to play these parties off against one another, diverting Plaintiff's attentions and hoping that the resultant paralysis will either inure to Farm House's benefit in settlement negotiations or, in the most extreme scenario, lead to the abandonment of all causes of action that are in litigation here. If for no reason other than the fact that it is manifestly and overwhelmingly self-serving, Farm House's objection on the fourth *Drexel v. Loomis* ground must be overruled.

Beyond its immediate effect, the settlement is still in the interests of Debtor's other creditors. The estate has already collected sufficient assets from the preference litigation to satisfy the first incremental payment owing to the secured lenders, and is well into the first increment which has been freed from their liens for distribution to unsecured creditors. Had Plaintiff not achieved this settlement, unsecured creditors would have waited until the successful completion of this litigation to receive a distribution, and even then would have received a distribution only if the net, post-collection recovery from the defendants exceeded the debt secured by encumbrances against the recovery. This litiga-

settling parties argue with some weight that Farm House accordingly lacks standing to object to the proposed settlement, the Court has decided to err in favor of ignoring the standing issue and of addressing Farm House's objections on their merits.

**22.** The estate was not completely hamstrung, as there is some question as to whether the secured creditors would have had standing to ultimately realize on their liens against the estate's prefer-

ence claims, suing in their own right as lienholders. *See Saline State Bank v. Mahloch,* 834 F.2d 690 (8th Cir.1987), and *Nebraska State Bank v. Jones,* 846 F.2d 477 (8th Cir.1988) (both holding that individual creditor does not have standing to wield lien-avoidance powers under 11 U.S.C. § 544). This circumstance almost certainly played a part in the estate's improvement in position between the first and second proposed settlements.

tion may yet consume years. Unsecured creditors' realization on their claims would have been delayed to an uncertain future date, and made subject to major litigation risks. Under the settlement, creditors will receive a small—but nonetheless certain—distribution on their claims before this litigation is finalized. While a few creditors (inveterate gamblers, all) might prefer to risk the possibility of no distribution against the prospect of a larger one, the Court is satisfied that grocery trade suppliers—the large majority of claimants against this estate—would apply the "bird-in-the-hand" principle here, and would favor this settlement. The alternatives—complete abandonment by the Trustee of these lawsuits, or the deferring of *any* distribution until a full victory over all of the defendants—simply do not offer the certainty which the proposed settlement does. Thus, from any perspective the fourth *Drexel v. Loomis* factor also militates in favor of the settlement.

### D. FARMHOUSE'S THIRD OBJECTION: PROPRIETY OF USE OF ASPECTS OF "PIERRINGER" RELEASE.

 Farm House's second substantive objection to the proposed settlement focuses on the fifth and sixth aspects of the stipulation (described at p. 989 *supra*). Under these terms, the bankruptcy estate fully releases Foothill and Berisford from all liability to the estate arising out of all transactions between them, and fully satisfies any fractional damage claim which Debtor might otherwise recover against the secured lenders as a result of any finding of their fault in, or responsibility for, Debtor's downfall. The estate also promises to indemnify Foothill and Berisford from all claims for contribution or indemnity which Farm House or any other potential co-defendant may bring. The settling parties expressly intend these provisions to have the same effect as a *Pierringer* release.[23]

---

**23.** This form of release takes its name from *Pierringer v. Hoger,* 21 Wis.2d 182, 124 N.W.2d 106 (1963), the first state Supreme Court case in

Farm House argues that a *Pierringer* release is inapplicable to fraudulent conveyance litigation because such a cause of action is not founded upon the same principles of liability as the negligence cause of action which spawned the release, and which necessarily structure the content and result of this form of settlement. It points out that fraudulent conveyance litigation is essentially a suit for damages for intentional wrongdoing, and notes that the Minnesota Supreme Court rejected the application of comparative-fault principles to actions for intentional fraud in *Florenzano v. Olson,* 387 N.W.2d 168 (Minn.1986). The argument is attractive on its surface. However, Farm House does not support the argument with a citation to any on-point authority from the Minnesota appellate courts—and a review of the relevant case-law leads to the conclusion that the Minnesota Supreme Court would not disapprove of the use of a *Pierringer* release in this setting.

As originally conceived, the *Pierringer* release "was designed to operate in a jurisdiction which has comparative negligence to apportion liability between defendants, uses the special verdict form, and allows contribution between joint tortfeasors." Simonett, *Rease of Joint Tortfeasors: Use of the Pierringer Release in Minnesota,* 3 WM. MITCHELL L.REV. 1, 11 (1977). In its simplest form, the *Pierringer* release:

1. releases the settling defendant from the lawsuit and discharges that part of the plaintiff's cause of action equal to that part attributable to the settling tortfeasor's causal negligence;

2. reserves "the balance of the whole cause of action" against the nonsettling joint tortfeasors; and

3. contains an agreement under which the plaintiff indemnifies the settling defendant from any claims on contribution made by the nonsettling parties, and agrees to satisfy any judgment he obtains from the nonsettling joint tortfeasors to the extent the settling tortfeasor has been released.

which the use of such a settlement vehicle was approved.

*Frey v. Snelgrove,* 269 N.W.2d 918, 920–1 n. 1 (Minn.1978); *Pierringer v. Hoger,* 124 N.W.2d at 108. "The Pierringer release is based on the formula that each joint tortfeasor including the nonsettling defendant is liable only for that part of the award which is his percentage of causal negligence." *Frey v. Snelgrove,* 269 N.W.2d at 922. Upon consummation of the settlement, the settling defendants usually should be dismissed out of the litigation, but the factual question of the degree of their fault should nonetheless be submitted for determination at trial. *Id.*

The plaintiff settling via a *Pierringer* release has the advantage of receiving at least a partial recovery without trial, and of being able to concentrate his litigation efforts against the nonsettling defendant. In deciding whether to enter a *Pierringer*-structured settlement, the plaintiff must weigh the possibility that the fact-finder will find that the nonsettling defendant either was not at fault, or was less at fault than the settling defendant. The risk, of course, is that the plaintiff's aggregate recovery may be diminished by submitting fewer than all of the original claims for adjudication and enforcement.

The settling defendant has the advantage of a complete release from the litigation, including a release and dismissal of the cross-claims brought against him by all nonsettling defendants who may be judged jointly and/or severally liable with him.

Obviously, litigants in forms of litigation to which the *Pierringer* release is more traditionally applied weigh these factors in determining whether to enter into a *Pierringer*-structured settlement, and in fixing the terms of that settlement.

The tactical utility of a *Pierringer*-structured partial settlement in civil litigation involving multiple defendants has led to its use in other contexts. *Barr/Nelson, Inc. v. Tonto's, Inc.,* 336 N.W.2d 46 (Minn.1983), involved tandem actions for breach of construction and insurance contracts and for an insurer's alleged bad faith in carrying out its obligation under a construction performance bond. The nonsettling defendant, the insurer under the bond, argued that the use of a *Pierringer* settlement by the plaintiff and the various construction contractor-defendants was "collusive and [had] the effect of juxtaposing the parties." The Minnesota Supreme Court rejected the argument and specifically approved the use of a *Pierringer*-structured release as a tool of settlement in construction contract disputes.

In *Barr/Nelson,* the plaintiff and the contractor/defendants settled their claims for breach of the construction contracts and agreed that all cross-claims arising out of those contracts were barred. The release specifically preserved the plaintiff's separate "bad faith" cause of action against the insurer. The contractors moved for summary judgment on the basis of the release, requesting that all but one of the insurer's cross-claims be dismissed as a matter of law. The insurer appealed from the grant of that motion. *See* 336 N.W.2d at 49. On appeal, the Minnesota Supreme Court almost summarily affirmed on this issue. It did not speak directly to the propriety of dismissing the insurer's cross-claims based upon the construction-contract relationship—though, in denying the award of damages attributable to the plaintiff's loss stemming from the failure to timely complete construction, the court concluded that the plaintiff had waived those claims in entering the *Pierringer* release with the contactors and could not seek reimbursement for those damages from the insurer. *See* 336 N.W.2d at 53. Because the insurer was successful in affirmatively asserting the *Pierringer* release in its favor on these damage issues as against the plaintiff, it never had to argue the issue of whether its cross-claims were properly barred by the approval of the *Pierringer* release. However, the Minnesota Supreme Court fully enforced the indemnity provisions of the release on the issue presented to it so it can safely be said that it gave its *imprimatur* to the dismissal of the counterclaims, even if *sub silentio.*

To be sure, *Barr/Nelson* is not on all fours with the present case. There, *all* of the contractor-defendants as to the common breach-of-contract claim settled with

the plaintiff, leaving the plaintiff to pursue a very different claim actionable only as against the insurer. While the defendants likely divided up their responsibility for the settlement payment to the plaintiff privately among themselves, the principles of contract law would not have provided for any such division of "fault," responsibility, and liability for the plaintiff's aggregate damages had the matter been tried to judgment. The initial mystery of the *Barr/Nelson* opinion is whether its general approval of the use of the *Pierringer* release "in construction contract disputes as a tool of settlement" would extend to the situation where less than the full number of contractor-defendants entered a *Pierringer*-structured settlement which provided for an assessment of the relative degree of accountability for the breach as among all of the contractor-defendants when the matter was tried. The Minnesota Supreme Court could not have failed to recognize the possibility that this question would arise in future litigation, however. Its broad grant of approval to the use of the release in multi-party contract litigation bespeaks an assumption that future cases would lead to the development of standards by which the courts could use in assessing such accountability.

The Minnesota Supreme Court's ready (almost perfunctory) adoption of a *Pierringer*-structured release in non-tort civil litigation involving multiple defendants demonstrates that court's preference for the use of innovative vehicles for settlement, and strongly suggests that it would approve its use in business litigation like the matters at bar. Plaintiff's fraudulent-conveyance causes of action all sound under the "constructive fraud" provisions of the Uniform Fraudulent Conveyance Act and 11 U.S.C. § 548. While the fraudulent-conveyance laws are designed to address conduct which is to some extent socially blameworthy, the actions at bar are not brought under the "actual fraud" provisions of those laws. The litigation will not directly join the factual question of whether the participants in the leveraged buyout actually had a fraudulent or predatory state of mind. While Plaintiff seeks to redress what he characterizes as a concerted, grievous inflection of harm on Debtor's creditors, this litigation is more akin to antitrust, securities, or class-action litigation than it is to a case of assault and battery, or the individualized consumer-fraud action which spawned *Florenzano v. Olson.* The punitive and deterrent goals of intentional-tort law therefore should not be the controlling principle which bars apportionment of fault and division of liability for damages as among the defendants to this litigation.[24] The causal connections between the secured creditors' and Farm House's respective participations in the leveraged buyout and Debtor's ultimate downfall may be established by evidentiary development. It is not clear whether the law will permit an apportionment of fault and liability among all of the defendants, on the "causal-fault" basis contemplated by the release. This legal question, however, may be joined and developed later by the remaining parties. The issue may boil down to one of fact; the parties may be able to establish by testimony of expert witnesses that each of the participants in the leveraged buyout should be found partially culpable for the injury to Debtor and its estate, or possibly that that injury would have naturally and directly resulted from the conduct of any one of the participants without the involvement of the others.[25] If such apportionment is permissible

---

24. A closer reading of *Florenzano v. Olson* reveals that Farm House's counsel has mis-cited it. In *dicta,* the Minnesota Supreme Court rejected the application of principles of comparative negligence to an intentional tort. 387 N.W.2d at 175–76. The case before it, however, involved the apportionment of fault *as between a plaintiff and the defendants. See* 387 N.W.2d at 176 n. 7. The court was not asked to apportion fault *as between jointly-liable defendants.*

25. For instance, Plaintiff may adduce evidence that the imposition of the debt burden resulting from the leveraged buyout would have made Debtor's continued operations impossible, even had Foothill not allegedly manipulated its secured position sap Debtor's vitality. Farm House could adduce evidence that Debtor could have indefinitely sustained operations under its post-leveraged buyout structure, had Foothill not used its "lending formula" to rapidly reduce its debt. Finally, it would be open to Farm

legally, Farm House will be adjudged liable for damages in an amount no more than that corresponding to the degree of its "causal fault." To the extent that such an apportionment is impermissible legally, or that factual development may not support it, the settlement will operate to impose full liability for any award of damages on Farm House, less any satisfaction from the other settling parties directly traceable to the consummated settlement of the fraudulent-conveyance cause of action.

There is nothing in the nature of a *Pierringer* release, any of its relevant aspects, or its theoretical underpinnings, which would prohibit its use in the context of fraudulent-conveyance litigation stemming from a complex leveraged buyout. To the contrary, as noted above, the use of this form of release will have the effect of narrowing and clarifying factual and legal issues, fixing burdens of production, and lightening the procedural and administrative burden of this litigation on the estate.

■ At oral argument, counsel for Farm House made one further objection to the use of a *Pierringer*-structured release which was specific to the facts of this adversary proceeding. Farm House objected that the retention by the secured creditors of their liens was inconsistent with the basic concept of a *Pierringer* release. The argument is a red herring, for two reasons. First, though the secured creditors are retaining liens until their debts are satisfied in full, the provision for a present incremental release of estate assets from the encumbrance of those liens clearly provides a *quid pro quo* for the estate's release of its causes of action against the secured

lenders. Second, the fact that Foothill and Berisford are not surrendering *all* of their secured rights at present is entirely beside the point. Compromise almost inevitably involves the forgoing of some claims and asserted rights, and the retention of others. It is almost fatuous to base an argument against a proposed settlement on the asserted merit of an expectation that a settling defendant would give a plaintiff the full benefit of its prayers for relief, without any concession.

**E. FARM HOUSE'S FOURTH OBJECTION: DANGER OF INFRINGEMENT ON TRUSTEE'S ADMINISTRATIVE DISCRETION**

■ As finally cast at oral argument, Farm House's third substantive objection to the proposed settlement stems from its ninth aspect (noted on p. 989 *supra*).[26] Under the stipulation, the trustee is obligated to "diligently pursue" this lawsuit against Farm House. (As a partially-reciprocal duty, Foothill and Berisford are obligated to cooperate in the prosecution of this litigation by providing non-privileged evidence to the trustee.)

A trustee in bankruptcy is charged with the fiduciary obligation of administering assets of the bankruptcy estate for the benefit of claimants against the estate. Under the fundamental division of administrative and judicial functions under the Bankruptcy Reform Act of 1978, the Chapter 7 Trustee is appointed and supervised by the United States Trustee, an official of the Department of Justice. The trustee appears before the Court as only one of many parties in interest to a bankruptcy case. The trustee is not responsible to any

---

House to take the position of assuming *some* responsibility for debilitating Debtor, but also to adduce evidence demonstrating that the secured lenders were "more at fault" for the eventual collapse, as a basis for the reduction of its liability for damages. The last possibility would be the most problematic of proof and of legal theory, but the Court is sure that Farm House's able counsel have already envisioned this line of defense and will be able to meet the challenge of convincingly preparing it.

**26.** In the memorandum originally submitted with its objection, Farm House alleged that the

settlement prohibited the trustee from settling or abandoning the estate's claims against Farm House without the consent of Foothill and Berisford. With some justification, Farm House argued that this provision severely restricted the trustee's decision-making power and invaded his administrative discretion. Farm House and its counsel drew this conclusion from the face of Plaintiff's settlement, which summarized the terms of a *tentative* stipulation. The stipulation as finally executed and filed deleted this provision, in favor of the one which was the subject of Farm House's objection at hearing.

individual creditor, claimant, or party-in-interest; rather, his obligation is to the creditors of each estate generally.

The administration of bankruptcy estates has twin goals of maximization of realization on creditors' claims and of prompt and efficient administration of the estate. To carry out his fiduciary duty to meet these goals, the trustee has a generally-recognized discretionary authority to take the actions that are necessary to accomplish them. In many instances, the exercise of that discretion is subject to review by the U.S. Trustee and to the Court's approval. In deciding whether to grant that approval, the Court reviews the circumstances and applies various legal tests involving appropriate factors.[27] The overlay of U.S. Trustee review, and the intertwining of administrative action with judicial approval after notice to interested parties, afford ample procedural and substantive safeguards against the possible abuse of discretion by the trustee.

The term of the proposed settlement requiring Plaintiff to "diligently pursue" the surviving counts of this litigation does nothing more or less than recognize Plaintiff's pre-existing duty to maximize the garnering of assets into this estate. It does not prohibit Plaintiff from "diligently pursuing" discovery, and then deciding to either settle or abandon the case against Farm House. Plaintiff has those options absent the settlement, and the wording of the stipulation does not expressly or impliedly prohibit him from electing one of them. If he were to elect either of these alternatives, his action would be contingent on court approval. 11 U.S.C. § 554(a); BANKR.R. 9010. Foothill, Berisford, and any other party interested in this case have the right under BANKR.R. 9019 and 2001(i) to receive notice of any such proposed action, and to have an opportunity to object to its merits. The stipulation does not and could not deprive them of those rights. Foothill and Berisford have prudently elected to rely upon those rights, rather than insisting upon the questionable

provision of the tentative stipulation—which could indeed be construed as giving them a veto power over any proposed settlement with Farm House. Farm House's objection to this provision is without merit.

## VI. CONCLUSION

These adversary proceedings involve complex factual disputes, and join difficult and often novel issues of law. They are among the most significant and far-reaching adversary proceedings brought in this Court since the enactment of the Bankruptcy Reform Act of 1978. The litigation promised to last for several years or more, and to consume large amounts of time, expense and effort. Plaintiff and two of the named defendants have now settled those causes of action which involve some of the most difficult and abstruse issues in the litigation. They have done so under terms which are fair and equitable to the bankruptcy estate.

The settlement does not deprive Farm House of the right to fully litigate any of its claimed defenses; nor does it materially prejudice it in any other way. It will at least initially narrow the issues and simplify the process of discovery; it will also fix various burdens of coming forward on the most salient issues.

It will have the welcome side-effect of finally resolving the issue of the bankruptcy estate's right to use Foothill's and Berisford's collateral to finance this and its other administrative activities, a troublesome question which was raised at virtually every hearing from May, 1986 until the conversion of Debtor's Chapter 11 case. (This effect is not completely coincidental; however, it is not the reason why the Court has approved the settlement.)

The Court has examined and treated the merits of all of Farm House's objections to the proposed settlement, to comply with the procedural mandates of *TMT Trailer Ferry*. The length of this memorandum should evidence that the Court has not merely "rubber-stamped" its approval of Plaintiff's action, but has made a reasoned

---

27. As, for instance, in the approval of a settle- ment or compromise like the matter at bar.

decision on the merits of the proposed settlement on the basis of all relevant factors.