**In re Clifford Ernest MEYER and Kathleen Ann Meyer, Debtors.**

**Bankruptcy No. 3–85–2943.**

United States Bankruptcy Court,
D. Minnesota,
Third Division.

Oct. 4, 1989.

Michael P. Kircher, St. James, Minn., for debtors.

Thomas F. Miller, Levy & Miller, Minneapolis, Minn., for debtors and Hyatt Legal Services.

Charles W. Ries, Farrish, Johnson & Maschka, Mankato, Minn., Trustee pro se.

GREGORY F. KISHEL, Bankruptcy Judge.

This reopened Chapter 7 case came on before the Court at Mankato, Minnesota, on February 28, 1989, for hearing on the Trustee's motion for approval of a proposed compromise and settlement of two controversies over rights of action to which the bankruptcy estate lay claim. Chapter 7 Trustee Charles W. Ries appeared *pro se*. Debtors appeared by their attorney, Michael P. Kircher. Thomas F. Miller appeared as co-counsel for Debtors and as counsel for Hyatt Legal Services, Debtors' former counsel of record in this case. Upon the moving documents, record made at hearing, and all of the other files, records, and proceedings in this case, the Court denies the motion, as to one of the two rights of action in question.[1]

## FINDINGS OF FACT

Debtors filed a voluntary petition under Chapter 7 of the Bankruptcy Code in this Court on December 3, 1985. Their counsel of record for the filing was Elliot N. Herland of Hyatt Legal Services, Minneapolis. In Item 10.b. of their Statement of Financial Affairs, which required them to disclose specific information regarding "suits, executions and attachments," they noted "I [sic] am also involved in a civil rights suit pending in Iowa District Court, but further

---

**1.** The Trustee's proposed settlement included disputed exemption claims to the subject of the present order, and to the "contingent claim of Clifford Meyer for conversion of exempt property against Randall state Bank." No creditor or party in interest objected to the terms of the Trustee's settlement of this latter dispute with Randall State Bank. The Court has approved the latter settlement by separate order.

information is unavailable at this time." This notation was at the end of a paragraph noting the *outcome* [2] of several debt-collection lawsuits concluded *against* Debtor Kathleen Meyer, under her former marital surname of Kathleen Granowski. Debtors did not schedule any property interest in rights of action, whether in suit or not, in their Schedule B–2, and did not claim any such assets as exempt in their Schedule B–4. They elected the "federal exemptions" of 11 U.S.C. § 522(d). On March 21, 1986, their Chapter 7 Trustee filed a Report in No–Asset Case, stating that he had discovered no assets from which to make a distribution to creditors. The Court (O'Brien, J.) entered an order closing this case on June 13, 1986.

On June 14, 1988, the Trustee filed an application to reopen this case and its bankruptcy estate, pursuant to 11 U.S.C. § 350(b). As cause for reopening, he stated that he had received information regarding assets which were now available to the estate for distribution to creditors. He received this information from Richard and Delores Blackford ("the Blackfords"), scheduled creditors.

After the Court entered an order reopening this case, the Trustee filed a motion for an order requiring Debtors to turn over certain assets, stating that those assets consisted of "a settlement in the amount of $65,000.00" from a civil rights action venued in the State of Iowa. At a September 27, 1988 hearing on that motion, the Trustee and attorneys from Hyatt Legal Services, then counsel for Debtors, appeared. All parties acknowledged through their counsel that, after the closing of this case, Kathleen Meyer had indeed received $50,000.00 in settlement of her civil rights claim against a former employer, which had been pending when Debtors had filed for bankruptcy. They also acknowledged that Debtors had since dissipated all of these funds.

They then stipulated to the entry of an order requiring Debtors to account for their prior receipt and disposition of "all proceeds received in the settlement of their civil rights action"; providing that "all proceeds received by the debtors and not claimed as exempt be turned over to the Trustee"; and staying the effectiveness of that order until October 11, 1988. The taped record for the hearing establishes beyond doubt that counsel stipulated to the stay of effectiveness to allow Debtors to amend their Schedule B–4 by the stated deadline. Via this amendment, Debtors were to claim all or a portion of the settlement proceeds as exempt. The Trustee was then to object to the amended claim of exemption as he deemed appropriate. If Debtors timely filed an amended Schedule B–4, the issue of how much of the settlement proceeds, if any, they had to turn over to the estate was to be deferred until after the exemption issue was settled. The Court entered an order embodying the operative terms of the stipulation on September 30, 1988.

Debtors did not file an amended Schedule B–4 until November 14, 1988, when Thomas F. Miller, attorney, filed one on their behalf. In an amended Schedule B–2 filed at the same time, Debtors noted under Item q. that they held an interest in a claim entitled *Kathleen Granowski v. Dows Comm. School District*, venued in the Iowa Civil Rights Commission, scheduling its value as "unknown." On the amended Schedule B–4, they claimed as exempt a "contingent claim for wages due," consisting of a "right to recover back wages from employer Dows School District—Iowa Civil Rights Commission case." They again scheduled the value of this asset as "unknown," and claimed it as exempt pursuant to MINN.STAT. § 550.37 subd. 13 and MINN.STAT. § 571.55.[3]

On several occasions during the fall of 1988, the Blackfords made several requests for relief relating to Debtors' obligation to

---

2. Item 10.*a.* of the Statement of Financial Affairs is the entry which requires the disclosure of *pending* litigation involving the debtor(s).

3. Via this amended Schedule B–4, Debtors switched the theory of their exemption claim in its entirety from the federal exemptions to those available under Minnesota state law.

turn over the settlement proceeds to the estate, via letter to the Court and via attempted *ex parte* motions. The Court declined to entertain these requests absent notice and a hearing. The Blackfords never requested a hearing on these matters.

The Trustee promptly objected to this amended claim of exemption. He asserted that the amendment was not timely made. He also objected to the statutory theory for the claim of exemption on its merits. At a December 13, 1988 hearing on the Trustee's objection, counsel for the parties (including counsel representing Hyatt Legal Services, which by then no longer represented Debtors for the purposes of these exemption proceedings) read a comprehensive stipulation on the record. The Court directed the Trustee to notice the settlement generally, and advised counsel that it would consider the Blackfords' prior communications to the Court as an ongoing objection to any terms of settlement which did not include a turnover to the Trustee of the full proceeds of the settlement.

In a Notice of Settlement filed and generally noticed in January, 1989, the Trustee set forth the terms of settlement. He disclosed that Debtor Kathleen Meyer had obtained a judgment against the Dows Community School District, her former employer, in an administrative civil rights proceeding on July 8, 1986, and that the order for that judgment read, in pertinent part:

> It is hereby ordered that the respondent pay Kathy Granowski back pay as if she had remained a full-time employee from the time her contract was reduced until to the commencement of the public hearing, plus 10% interest.

The Trustee further noted that Kathleen Meyer had later accepted $50,000.00 as a complete settlement of her entitlement under the judgment, and that in a 1983 decree of dissolution of her marriage to one Robert E. Granowski, her ex-husband had been awarded an entitlement to one-half of any future net proceeds of the civil rights proceeding. Finally, the Trustee noted that he

believed that "75 percent of the remaining $25,000.00 may constitute earnings as defined by [MINN.STAT. §] 571.55," and that Debtors had by then "dissipated all monies received and the monies used to pay mortgage on [their] homestead and other living and educational expenses, making the likelihood of a judicial recovery difficult."

The Trustee proposed to accept $7,000.00 in settlement, consisting of $6,250.00 as that portion of the settlement which would not have been exempt under the asserted theory, plus $750.00 "for the costs of litigation." The consideration for this payment would be the Trustee's withdrawal of his objection to Debtors' claim of exemption in the balance of the settlement proceeds. No creditor or other party in interest has formally objected to the settlement other than the Blackfords, who have continued to communicate their dissatisfaction to the Court, *ex parte* and in later hearings on other proceedings in this case. The Trustee and other parties presented no formal evidence at the February 28, 1989 hearing on the motion for approval of the settlement.

## DISCUSSION

■ One point joined repeatedly by the Blackfords can be laid to rest without lengthy discussion. The estate's potential interest in the right of action was only an undivided one-half interest in the full value. That is the property interest in the right of action which Kathleen Meyer retained as of the date when she filed for bankruptcy, under the comprehensive marital property settlement in her 1983 divorce decree entered in Steele County Court.[4] Only those property interests which a debtor holds *as of the commencement of a bankruptcy case* pass into the estate by operation of 11 U.S.C. § 541(a)(1). *In re Schauer*, 62 B.R. 526, 529 (Bankr.D.Minn.1986), *aff'd*, 835 F.2d 1222 (8th Cir.1987). The fact that her ex-husband may have relinquished his share back to her when the civil rights settlement was consummated post-petition

---

4. Though no party to this motion ever put a copy of the Judgment and Decree into the formal record, the Blackfords appended it to one

of their several letters. The court has taken judicial notice of it, as a part of the public records of another court.

is irrelevant. Thus, the value of the potential estate asset at issue here is $25,000.00. This point being resolved, the settlement may be addressed with reference to the *Drexel v. Loomis* test.

## A. General Standards for Approval of Compromise or Settlement of Controversy.

The Trustee seeks an order of this Court approving the proposed settlement, pursuant to BANKR.R. 9019. Approval or disapproval of a proposed settlement of a dispute to which a bankruptcy estate is a party is committed to the discretion of the Bankruptcy Court. *In re Flight Transportation Corp. Securities Litigation,* 730 F.2d 1128, 1135 (8th Cir.1984), *cert. den.,* 469 U.S. 1207, 105 S.Ct. 1169, 84 L.Ed.2d 320 (1985). In exercising this discretion, however, the Bankruptcy Court must consider several relevant factors, which were first recognized by the Eighth Circuit in *Drexel v. Loomis,* 35 F.2d 800 (8th Cir. 1929). *See also In re Lakeland Development Corp.,* 48 B.R. 85 (Bankr.D.Minn. 1985), *aff'd,* 782 F.2d 1048 (8th Cir.1985), *cert. den.,* 476 U.S. 1130, 106 S.Ct. 1999, 90 L.Ed.2d 680 (1986); *In re Hanson Industries, Inc.,* 88 B.R. 942 (Bankr.D.Minn. 1988); *In re Hancock–Nelson Mercantile Co., Inc.,* 95 B.R. 982 (Bankr.D.Minn.1989), *aff'd* in Memorandum Opinion and Order, CIV 4–88–740 (D.Minn. June 28, 1989). The Bankruptcy Court is not to rely solely upon the Trustee's representations that the settlement is in the best interests of the estate. Rather, it must make an "informed, *independent* judgment" (emphasis added) on the settlement after the parties have adequately developed the underlying facts and after the Court has thoroughly reviewed relevant parts of the record. *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc., v. Anderson,* 390 U.S. 414, 424 and 434, 88 S.Ct. 1157, 1163 and 1168, 20 L.Ed.2d 1 (1968), *rehrg den.,* 391 U.S. 909, 88 S.Ct. 1649, 20 L.Ed.2d 425 (1969) (*"TMT Trailer Ferry"*); *In re Hancock–Nelson Mercantile Co., Inc.,* 95 B.R. at 990.

## B. Relevant Factors Under Drexel v. Loomis.

*1. Probability of success in the litigation.* The first *Drexel v. Loomis* factor requires the Court to determine whether the bankruptcy estate would be likely to succeed on the merits of the subject controversy, were the matter fully litigated. Basically, the Court must determine the estate's litigation risk, and then determine whether the amount tendered in settlement is commensurate to that litigation risk.

In the matter at bar, the bankruptcy estate's litigation posture is so strong, and its likelihood of success on the merits so great, that the amount tendered by Debtors in settlement is insufficient to compensate the estate for the rights which the estate would forego. This is so for two reasons—one ultimately procedural, one ultimately substantive.

The Trustee proposes to give up his right to recover any assets from Debtors on account of Kathleen Meyer's right of recovery on her civil rights claim, in excess of the sum of $7,000.00. He would do so by essentially conceding that the remainder of the funds which she received and dissipated would have been classifiable as "earnings," and would have been exemptible from the bankruptcy estate under Minnesota statute.

However, pursuant to the plain terms of the settlement and the parties' understandings which were read onto the record on September 27, 1988, Debtors waived their right to claim *any* of Kathleen Meyer's property rights in the settlement proceeds as exempt, by failing to timely file an amended Schedule B–4 asserting that claim of exemption. At the time of that hearing, the Trustee was understandably concerned about settling the potential exemption issue, so it would not interfere with the enforcement of the turnover order which he sought. He insisted upon fixing a deadline for Debtors to raise the exemption claim, which they had failed to do when this case was originally pending. He did avoid committing estate resources to recovery only to have Debtors claim the settle-

ment proceeds as exempt within the loose and open-ended timeframe contemplated by BANKR.R. 1009(a).

Thus, both and he and Debtors' counsel acknowledged that the turnover order would be stayed to allow Debtors to join the exemption issue. The necessary concomitant was that the turnover order would become effective—*and Debtors would be barred from amending their exemption claim to include any portion of the settlement proceeds*—if Debtors failed to serve and file an amended Schedule B-4 by October 11, 1988. They failed to do so, and are now bound by their prior claim of exemptions—which did not include a claim for any portion of the settlement proceeds. Thus, under the configuration of exemption claims and property rights which was fixed and made final on October 11, 1988, the Trustee has the right to the full proceeds of settlement. He need not accept anything less on account of any factor other than the practical enforceability of the turnover order.

Even if the foregoing were not the case, however, the Trustee is not under substantial litigation risk on the merits of his objection to Debtors' claim of exemption. As a result, a settlement which waives 75 percent of the value of the estate's entitlement is improvident.

Simply stated, the proceeds of Kathleen Meyer's settlement of her civil rights claim are not "earnings subject to garnishment by the provisions of [MINN.STAT. §] 571.-55" within the scope of MINN.STAT. § 550.37 subd. 13. That provision (part of Minnesota's general exemption statute) incorporates by reference those provisions of the Minnesota garnishment statute which limit a judgment creditor's right to attach a judgment debtor's income stream at its source, the judgment debtor's employer. For the purposes of the statutory limitation on garnishment, " 'earnings' means *compensation paid or payable for personal*

*service ...* whether denominated as wages, salary, commissions, bonus or otherwise ..." MINN.STAT. § 571.55 subd. 1 (emphasis added). Under the pertinent language of the statute, "[t]he maximum part of the aggregate disposable earnings of an individual for any pay period which may be subjected to garnishment may not exceed ... 25 percent of the disposable earnings ..." MINN.STAT. § 571.55 subd. 2.[5] The statute further defines "disposable earnings" as "that part of the earnings of an individual remaining after the deduction from those earnings of amounts required by law to be withheld." MINN.STAT. § 571.55 subd. 1. The general exemption statute then extends the coverage of this limitation on garnishment of earnings in the employer's hands, to funds on deposit in any financial institution which are traceable to exempt earnings, for a period of 20 days after deposit. MINN.STAT. § 550.37 subd. 13.

The structure of this statutory scheme protects only a judgment debtor's right to receive up to 75 percent of an ongoing income stream. By its facial reference to "compensation paid or payable for personal service," it encompasses no more than the right to receive payment from an employer in consideration for work services actually rendered—and only at the point of actual disbursement or, if commingled in a bank account, within 20 days after deposit.[6] The asset in question here is something very different. When Debtors commenced this case it was an unfixed, unliquidated right to recover damages for a deprivation of Kathleen Meyer's right to be free from discriminatory treatment in the terms and conditions of her employment. Put another way, it was a legal right to be made whole for the loss which she had suffered by her employer's misconduct, by a payment of the amount of wages which she would have earned had her employment not

---

5. The alternative limitation on garnishment under MINN.STAT. § 571.55 subd. 2—that establishing a minimum aggregate amount of net wages exempt, keyed into the current federal minimum wage—does not seem to be applicable here.

6. Thus, cash in the hands of a judgment debtor or a third person, or a balance in a bank account more than 20 days after deposit, cannot be exempted under this statute—even if directly and indisputably traceable to a debtor's "earnings."

been reduced or terminated via her employer's discriminatory conduct.

Kathleen Meyer never rendered personal services to her employer in consideration for the money which she claimed and ultimately received from that employer. The fact that the amount of money which she actually received was less than her full entitlement under the administrative judgment—a concession apparently made in consideration for the settlement of a pending appeal—only further underlines the difference between these property rights and those which are protected under the statute. There simply is no legally-cognizable connection between the source of her claim on the one hand, and, on the other, the actual performance of personal services which is the contemplated consideration for the "earnings" which are protected under MINN.STAT. §§ 550.37 subd. 13 and 571.-55. *Compare In re Selby*, 76 B.R. 170 (Bankr.D.Ore.1987) (payments made in exchange for covenant not to compete are not in consideration for personal services and, hence, are not exempt "earnings").

The asset which Debtors should have disclosed in their original schedules was a right of action, a species of property right comparable to the "right ... of action for injuries to the person of the debtor or of a relative whether or not resulting in death," which is protected under MINN.STAT. § 550.37 subd. 22.[7] It was not the sort of property right which is protected in major part by the earnings exemption of MINN. STAT. § 550.37 subd. 13. This Court recognizes the numerous decisions which dictate that exemption statutes are to be construed broadly, to achieve their humanitarian goals. *See, e.g., DeCoster v. Nenno*, 171 Minn. 108, 213 N.W. 538 (1927); *Grimestad v. Lofgren*, 105 Minn. 286, 117 N.W. 515 (1908); *Rustad v. Bishop*, 80 Minn. 497, 83 N.W. 449 (1900); *Boelter v. Klossner*, 74 Minn. 272, 77 N.W. 4 (1898); *Rothschild v. Boelter*, 18 Minn. 362 (1872). A broad construction which exceeds the clear scope of the statutory language, however, cannot be defended by merely invoking this chestnut of debtor-creditor law. Had the Minnesota State Legislature intended to make an unliquidated cause of action for damages under a state human rights act exempt in whole or in part, it could have done so easily, by a specific enactment, as it did for personal-injury rights of action.[8] *Fullerton Lumber Co. v. Carstens*, 248 Minn. 254, 264, 80 N.W.2d 1, 7 (1956) ("The ... legislative intent was to adopt specific and restricted terms in place of a general one and ... by this process a legislative intent was manifested that only the subjects definitely and specifically enumerated were to be exempt"); *Poznanovic v. Maki*, 209 Minn. 379, 383–84, 296 N.W. 415, 417 (1941); *DeCoster v. Nenno*, 171 Minn. at 110, 213 N.W. at 539 ("The legislature has made a lengthy list of the property and the classes of property which are to be exempt from seizure from debt, and, if it had intended to exempt such property as that in question, ... it would have indicated such intention in some definite manner ..."). It did not do so.[9] This Court cannot exercise the legislative function by contorting the present statutory exemption scheme to create such an exemption out of whole cloth.

Thus, the Trustee's objection to Debtors' amended claim of exemption would be sustained on its merits, even had Debtors timely made that amended claim of exemption or were their amendment now to be considered as timely. This then means that the Trustee has a certainty of success on

---

**7.** In fact, Judge Dennis D. O'Brien has recognized that a special-damages claim for lost earnings may be a distinct component of a personal injury right of action for bankruptcy purposes. *See In re Bailey*, 84 B.R. 608, 611 (Bankr.D. Minn.1988).

**8.** This is not to be taken as a pronouncement on the constitutionality of MINN.STAT. § 550.37 subd. 22, an issue currently in litigation in another case before the undersigned.

**9.** Review of the Minnesota Human Rights Act, MINN.STAT. § 363.01 *et seq.*, reveals no provision in it that makes a right of action or an award of damages under it exempt from claims of creditors. The general exemption statute, MINN.STAT. § 550.37, contains no exemption for such rights under the Minnesota act or that of any other state.

the merits of an objection to that exemption claim. Thus, the first *Drexel v. Loomis* factor militates entirely against approving the proposed settlement.

*2. Potential Difficulty in Collection of Litigated Judgment.* This second *Drexel v. Loomis* factor requires another assessment of risk, this time one of the estate's collection risk. This is largely a "bird in the hand" consideration. *In re Hancock–Nelson Mercantile Co., Inc.,* 95 B.R. at 996. The Trustee has stated in a fairly conclusory fashion that he does not believe that Debtors have the means to fully comply with the turnover order, or that the estate could collect the full amount of any subsequent judgment against them. He has presented no concrete evidence going to Debtors' current financial position. The only "evidence" of record as to this ultimate fact is the mere circumstance that Debtors filed for bankruptcy relief five years ago. This fact standing alone does not strongly support *any* inference as to their financial state; Debtors may still be in a desperate or marginal state, or they may have achieved their "fresh start" and attained solvency. On the record before this Court, one simply cannot tell.

As the proponent of the proposed settlement, the Trustee had the obligation to bring forward some probative evidence on this point, at least as a hedge against an objection on this ground. *TMT Trailer Ferry,* 390 U.S. at 440–41, 88 S.Ct. at 1171–72. The lack of such a record is one good reason supporting denial of the proposed settlement, especially where the estate's poor chances of satisfaction under the turnover order are asserted as a major basis for settlement. So, too, is the distinct possibility that the funds for satisfaction of Debtors' turnover obligation may ultimately come from a collateral source.[10]

*3. Complexity of the Litigation and the Expense, Inconvenience, and Delay Which Would be Occasioned by it.* The third *Drexel v. Loomis* factor basically requires the Court to determine whether pursuing the controversy on its merits would produce a sufficient net benefit to the estate. The Court must consider such items as the likely burden on the trial court and the parties which would result from continued litigation; the likely amount of administrative-expense claims which would accrue in the form of attorney, expert witness, and other professional fees, deposition and subpoena costs, and other litigation expenses; the length of the delay in creditors' realization which would result from deferring resolution of the controversy in favor of full litigation; and other factors which would reduce the real value of any collected judgment in comparison to the in-hand present value of the settlement. The Court's disposition of the first *Drexel · v. Loomis* factor renders this a non-issue, as the Court has concluded that the "controversy" was procedurally settled and, in any event, the Trustee would prevail as a matter of law on it. Thus, there need be no further litigation, no further delay, and no further expense.

*4. The Paramount Interests of Creditors.* The fourth *Drexel v. Loomis* factor is the major—though not ultimately the controlling—consideration. *In re Flight Transportation Corp. Securities Litigation,* 730 F.2d at 1135. The obvious interest of any unsecured creditor in a Chapter 7 bankruptcy case is to be paid as much on account of its claim, as quickly as possible. When the Trustee has a dispute with a third party over a particular asset which is asserted to be property of the bankruptcy estate, this creditor's interest translates into an interest in seeing that as much of the value attributable to the disputed asset is brought into the estate as possible.

---

**10.** It is uncertain who was really responsible for Debtors' failure to fully disclose the existence of the right of action *as an asset,* and for their failure to account to the estate for it during the period when this case was first pending. To date, the most any party has said is that there was a "misunderstanding" between Debtors and their former counsel as to who would have the right to the civil rights claim after bankruptcy. This gentlemanly equivocation may not survive the present order; and, ultimately, someone other than Debtors may be called to answer for the sequence of events which led to the present imbroglio. These issues, however, will likely be joined in another forum to the extent they are not promptly settled out of court.

Where a proposed settlement proposes to forego the major part of the apparent value of an asset to avoid alleged litigation risk in the liquidation of that asset, the Court must weigh several factors: the percentage of potential recovery which the estate is giving up; the magnitude of the litigation risk which the estate would otherwise bear; the delay in realization which would be occasioned by litigation; the "investment" factor (under which creditors' interests in promptly receiving a distribution for their own, self-directed reinvestment must be compared with the "rate of return" which might be obtained by giving up the proposed settlement in favor of litigating the controversy); and other similar circumstances. *See In re Hanson Industries, Inc.,* 88 B.R. at 950; *In re Hancock–Nelson Mercantile Co., Inc.,* 95 B.R. at 998–99. This inquiry is again principally governed by the "bird in the hand" principle.

Here, the factor of a prompt receipt in settlement cannot be ignored, as Debtors (or, possibly, Hyatt Legal Services) have already escrowed $7,000.00 with the Trustee. However, the only further delay which otherwise would enhance the value of the settlement would be that in collection of the balance of the estate's entitlement. The circumstances merit the extreme step of considering the $7,000.00 as having been surrendered to the estate in partial satisfaction of the turnover order regardless of the outcome of this proceeding. Debtors (and whichever counsel was then representing them) materially weakened their current position by failing to timely amend their Schedule B-4. This whole problem would have been avoided in 1985 had Debtors and their counsel brought the existence of the civil rights claim to the Trustee's attention by properly scheduling it. These shortcomings have generated unnecessary work for the Trustee and the Court, further burdened the estate with administrative-expense claims, and delayed a distribution to creditors by three years or more. The $7,000.00 is in the estate's hands and will stay there. Given the combination of other circumstances, the interests of creditors are best served by keeping that sum, and taking whatever steps are necessary to garner the remaining $18,000.00 into the estate. Debtors—and any responsible collateral source—should have to account for the remainder, and quite possibly will be able to account for it. The Court, therefore, will order that the amount on escrow be retained by the Trustee, for application to Debtors' outstanding turnover obligation, but not in complete satisfaction of that obligation. The Trustee may commence other litigation to enforce Debtors' remaining obligation.

*5. Whether Conclusion of the Litigation Via Settlement Promotes the Integrity of the Judicial System.* While not a factor originally recognized by the Eighth Circuit in *Drexel v. Loomis,* this "public policy" factor was suggested by Judge Kressel in *In re Lakeland Development Corp.,* 48 B.R. at 90. In most motions under BANKR.R. 9019, the only public-policy consideration is the general interest in the conservation of private and judicial resources via settlement of litigable disputes; this fifth factor hence plays a relatively small role in most cases.

Here, however, a more specific public-interest concern militates against the proposed settlement. The public's confidence in the system of bankruptcy administration is fostered only so long as the statutory balance between debtor's and creditor's rights is maintained in judicial decision-making. One of these fundamental balances in the context of an individual Chapter 7 case is that between the debtor's ultimate remedy (discharge of debt) and the unsecured creditor's ultimate entitlement (a pro rata share of the debtor's nonexempt assets, upon application of the statutory priority of claims). That balance is materially upset where, as here, the debtor has received the full benefit of bankruptcy discharge but, for whatever reason, has failed to surrender all nonexempt property to the estate. Approval of this settlement would ratify that imbalance. This simply cannot be suffered.

On the basis of the foregoing conclusions,

IT IS HEREBY ORDERED:

1. That the Trustee's motion for approval of his proposed settlement of a dispute over the estate's rights to Kathleen Meyer's pre-petition civil rights claim against her former employer is denied.

2. That the Trustee shall retain the sum of $7,000.00, deposited with him on Debtors' behalf in connection with the present motion, in partial satisfaction of Debtors' obligation under this Court's September 30, 1988 turnover order, and shall administer that sum as an asset of the bankruptcy estate.

3. That Debtors shall comply with their remaining turnover obligation under the Court's September 30, 1988 order by forwarding to him the sum· of $18,000.00, no later than *November 8, 1989.*

4. That Debtors are hereby advised that their failure to fully and timely comply with Term 3 of this order shall:

a. entitle the Trustee to entry of a money judgment in his favor in an adversary proceeding which he may commence against them if Debtors do not fully and timely comply with Term 3 of this order;

b. entitle the Trustee or any other party in interest in this case to a judgment revoking Debtors' discharge in bankruptcy pursuant to 11 U.S.C. §§ 727(d)(3) and 727(a)(6), in an adversary proceeding which any such party or parties may commence if Debtors do not fully and timely comply with Term 3 of this order.